IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FRANK D'ELIA, M.D.** | : | |
| | : | CIVIL ACTION |
| **Plaintiff,** | : | |
| v. | : | |
| | : | NO.   15-3040 |
| **UNUM LIFE INSURANCE COMPANY** | : | |
| **OF AMERICA** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

**Rufe, J.**                                                                                                                                                                                          **August 15, 2016**

Before the Court is Defendant's Choice of Law Motion.   For the following reasons, the Court will grant Defendant's motion and hold that Plaintiff's claims against Defendant are governed by the Employee Retirement Income Security Act of 1974 ("ERISA").[1]

## I.   FACTUAL BACKGROUND

The Complaint alleges that Plaintiff Frank D'Elia M.D., FACS has been a urological surgeon for thirty-five years.   Between 1984 and 1997, Plaintiff purchased five disability income policies from Defendant Unum Life Insurance Company of America:

1. The 1984 Policy - Policy Number LAN70795.
2. The 1985 Policy - Policy Number LAN767140
3. The 1992 Policy - Policy Number LAD168221
4. The 1993 Policy - Policy Number LAD228068
5. The 1997 Policy - Policy Number LAN783346.[2]

Carl Lipschutz, an authorized agent of Unum, sold all five policies to Plaintiff, each of which stated that it was to be paid as part of Defendant's FlexBill billing arrangement through

---

[1] 29 U.S.C. § 1001, et seq.

[2] Def.'s Mot. Choice of Law ("Def.'s Mot."), Exs. 1, 2, 3, 4, 5, 7, 8, 9, 11.

Plaintiff's employer, Associates in Urology ("AIU").[3] Unum also issued at least three other disability policies to two of Plaintiff's colleagues at AIU, Drs. Weisman and Walker.[4] Except for the monthly disability benefit amounts, these policies are identical in all material respects to those issued to Plaintiff. The applications for Plaintiff's 1992 Policy, Dr. Weisman's 1992 policy, and Dr. Walker's 1992 policy were all signed on the same day, November 12, 1991.[5]

Plaintiff's 1983, 1985, and 1997 Policies defined "[t]otal disability" and "totally disabled" as being "unable to perform the material and substantial duties of your occupation. Your occupation means your regular occupation at the time disability commences."[6] The policies identified Plaintiff's occupation as "Medical Doctor — Urologist."[7] Based on representations by Mr. Lipschutz about Dr. Weisman's identical policy, Plaintiff understood that the ability to conduct surgery was a "material and substantial duty" of his practice, such that an inability to conduct surgery would render him "totally disabled."[8] In reliance on that understanding, Plaintiff purchased two more disability policies from Unum in 1992 and 1993.[9] Both of those policies defined "[t]otal disability" and "totally disabled" as an "injury or sickness [that] restricts your ability to perform the material and substantial duties off your regular occupation to an extent that prevents you from engaging in your regular occupation."[10] For insureds that "engage primarily in a professionally recognized speciality, 'regular occupation' is

---

[3] Def.'s Mot. Ex. 1 at 3, Ex. 3 at 3, Ex. 5 at 3, Ex 8 at 3, & Ex. 9 at 3.
[4] Id. Ex. 12.
[5] Id. Exs. 5
[6] Compl. ¶ 9.
[7] Id. ¶ 10.
[8] Id. ¶ 12.
[9] Id. ¶ 13.
[10] Id. ¶ 14.

defined as that speciality."[11] Plaintiff continued to pay tens of thousands of dollars in premiums to Unum over the years for all five disability Policies.[12]

On June 20, 2012, while making home repairs, Plaintiff injured his left index finger.[13] At the time, he was practicing as the Chief of the Division of Urology at Crozer-Chester Medical Center, the Chief of the Division of Urologic Oncology at Crozer-Chester Medical Center, the Co-Chief of Urologic Surgery at Riddle Hospital, and a Urologist at Associates in Urology, specializing in Urologic Oncology and Surgery.[14] After the injury, Plaintiff could no longer perform surgical procedures due to pain and weakness in the injured finger.[15]

As a result of his injury, and after Plaintiff accepted his inability to operate, Plaintiff filed claims with Unum on August 21, 2013, seeking disability benefits with a disability date of June 21, 2012[16]—the day after the injury.[17] After a lengthy claim period, Unum denied benefits and, on December 17, 2014, Plaintiff filed a formal appeal.[18] On March 11, 2015, more than nineteen months after Plaintiff filed his original claim, Unum denied his appeal.[19]

Plaintiff then filed suit in the Pennsylvania Court of Common Pleas for Delaware County alleging state law breach of contract, a claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, and a claim for bad faith. Unum removed the case to federal court.

---

[11] Id.

[12] Id.

[13] Id. ¶ 17.

[14] Id. ¶ 18.

[15] Id. ¶ 19.

[16] The Complaint refers to June 21, 2013 as the day after the injury. The Court assumes that this is a typographical error.

[17] Id.

[18] Id. ¶ 57.

[19] Id. ¶ 61.

The Court[20] allowed a brief period of discovery as to the applicability of ERISA, after which Defendant filed the current motion, which has been exhaustively briefed.

## II. DISCUSSION

Unum's Motion seeks a declaration by this Court that ERISA governs Plaintiff's five disability insurance policies and preempts his state law claims. ERISA is a "comprehensive federal statute enacted 'in the interests of employees and their beneficiaries' to afford minimum standards to employee benefit plans, 'assuring the equitable character of such plans and their financial soundness.'"[21] It provides for the uniform federal regulation of employee benefit plans and promotes administrative efficiency through the exclusive federal regulation of such plans.[22] "ERISA subjects employee benefit plans to participation, funding, and vesting requirements, and to uniform standards on matters like reporting, disclosure, and fiduciary responsibility."[23] Under 29 U.S.C. § 1144(a), ERISA "broadly preempts" state laws that relate to an ERISA plan.[24]

The United States Court of Appeals for the Third Circuit has recognized that "ERISA applies to 'any employee benefit plan if it is established or maintained . . . by any employer engaged in commerce.'"[25] In order for an employee welfare benefit plan to fall within ERISA's scope, it must satisfy five elements: "(1) a 'plan, fund, or program'[;] (2) established or maintained[;] (3) by an employer[;] (4) for the purpose of providing health care or disability

---

[20] The Honorable Ronald L. Buckwalter, to whose docket this case was previously assigned.

[21] Page v. Bancroft Neurohealth, Inc., 575 F. Supp. 2d 664, 670-71 (E.D. Pa. 2008) (citing 29 U.S.C. § 1001(a)).

[22] Keystone Chapter, Assoc. Builders & Contractors, Inc. v. Foley, 37 F.3d 945, 954 (3d Cir. 1994).

[23] Id. (citing Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 90-91 (1983)).

[24] Menkes v. Prudential Ins. Co. of Am., 762 F.3d 285, 290 (3d Cir. 2014).

[25] Deibler v. United Food and Commercial Workers' Local Union 23, 973 F.2d 206, 209 (3d Cir. 1992) (quoting 29 U.S.C. § 1003(a)).

benefits[;] (5) to participants or their beneficiaries."[26] "Whether a plan exists within the meaning of ERISA is 'a question of fact, to be answered in light of all the surrounding facts and circumstances from the point of view of a reasonable person.'"[27] The burden of proof rests with the party asserting preemption.[28]

### A. Safe Harbor Provision

Even if a plan might otherwise be covered by ERISA, a "Safe Harbor" provision may apply, as certain practices do not constitute employee welfare benefit plans for the purposes of Title I of ERISA.[29] As explained by the United States Court of Appeals for the First Circuit:

> The safe harbor dredged by the regulation operates on the premise that the absence of employer involvement vitiates the necessity for ERISA safeguards. In theory, an employer can assist its work force by arranging for the provision of desirable coverage at attractive rates, but, by complying with the regulation, assure itself that, if it acts only as an honest broker and remains neutral vis-a-vis the plan's operation, it will not be put to the trouble and expense that meeting ERISA's requirements entails. Failure to fulfill any one of the four criteria listed in the regulation, however, closes the safe harbor and exposes a group insurance program, if it otherwise qualifies as an ERISA program, to the strictures of the Act.[30]

Under the Safe Harbor, the terms "employee welfare benefit plan" and "welfare plan" do not include a group or group-type insurance program offered by an insurer to employees or members of an employee organization, under which:

---

[26] Stone v. Disability Mgmt. Servs., Inc., 288 F. Supp. 2d 684, 688 (M.D. Pa. 2003) (citations omitted). See also 29 U.S.C. § 1002(1) (An "employee welfare benefit plan" or "welfare plan" is "any plan, fund, or program . . . established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries . . . benefits in the event of sickness, accident, [or] disability… .").

[27] Deibler, 973 F.2d at 209-10 (quoting Wickman v. Nw. Nat'l Ins. Co., 908 F.2d 1077, 1082 (1st Cir. 1990)).

[28] Arsdel v. Liberty Life Assurance Co. of Boston, No. 14-2579, 2016 WL 1237317, at *9 (E.D. Pa. Mar. 29, 2016).

[29] 29 C.F.R. § 2510.3-1(j).

[30] Johnson v. Watts Regulator Co., 63 F.3d 1129, 1133 (1st Cir. 1995).

> (1) No contributions are made by an employer or employee organization;
>
> (2) Participation [in] the program is completely voluntary for employees or members;
>
> (3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and
>
> (4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.[31]

All four factors must be met for a plan to fall within the regulation.[32] In this case, the parties agree that factors two and four are met, but dispute the existence of factors one and three.

The first factor of the Safe Harbor provision requires that the employer makes no contributions to the plan at issue. The Third Circuit has not yet interpreted this requirement, but "several courts within this circuit have . . . concluded that 'contribution' should be given its clear meaning."[33] "Where an employer provides its employees benefits that they [cannot] receive as individuals, it has contributed to an ERISA plan,"[34] or if "an employer pays for a premium, then it has contributed."[35] In addition, "group discounts applied to employee insurance policies,

---

[31] 29 C.F.R. § 2510.3-1(j).

[32] Stone, 288 F. Supp. 2d at 691. The question of which party bears the burden of proving the applicability or inapplicability of the safe harbor provision remains unresolved in this Circuit. Arsdel, 2016 WL 1237317, at *9 (surveying the conflicting jurisprudence on the issue). A recent decision from this District opined that "the more persuasive rationale lies with those cases holding that the burden of proof remains with the party asserting preemption under ERISA to also establish that the safe harbor provision is inapplicable." Id. Although the allocation of the burden of proof in this case is not determinative of the outcome for purposes of this motion, the Court holds that the burden of proof rests with Defendant as the party asserting ERISA's applicability.

[33] McCann v. Unum Provident, 921 F. Supp. 2d 353, 366 (D.N.J. 2013) (citing Morris v. Paul Revere Ins. Grp., 986 F. Supp. 872, 880 (D.N.J. 1997)).

[34] Brown v. The Paul Revere Life Ins. Co., No. 01–1931, 2002 WL 1019021, at *7 (E.D. Pa. May 20, 2002) (citation omitted).

[35] Stone, 288 F. Supp. 2d at 691 (citation omitted).

issued pursuant to an employee welfare benefit plan, constitute employer contributions."[36] Finally, if the employer subsidizes even a portion of the premiums, the Safe Harbor status is defeated.[37]

AIU has produced persuasive evidence that it "contributed" to the Policies in several ways. First, all five of Plaintiff's Policies were part of the Unum FlexBill program. According to the affidavit of Nancy Maintanis, an Unum Group IDI Service Specialist, the FlexBill program permits employers, at their election, to group three or more individual Unum insurance policies held by full-time employees of the same company within the same billing arrangement.[38] When policies are billed through Unum's FlexBill program, participants receive up to a thirty-five percent discount from standard premium rates.[39] Each of Plaintiff's Policies was included in one of two Unum FlexBill arrangements established for AIU.[40] The evidence further shows that

---

[36] McCann, 921 F. Supp. 2d at 366 (citing Harding v. Provident Life & Accident Ins. Co., 809 F. Supp. 2d 403, 417–18 (W.D. Pa. 2011). See also Healy v. Minnesota Life Ins. Co., No. 11-659, 2012 WL 566759, at *5 (W.D. Mo. Feb. 21, 2012) (finding that the discount attributed to Plaintiff by virtue of the employer's agreement to transmit Plaintiff's premium payments on the policy was a "contribution" for purposes of removing this policy from the Safe Harbor provision); Moore v. Life Ins. Co. of N. Am., 708 F. Supp. 2d 597, 607 (N.D. W.Va. 2010) (holding that although the plaintiff paid his own premiums for the coverage, he benefitted from a unitary rate structure negotiated by the employer, and therefore "effectively received a premium discount or constructive contribution" from the employer), aff'd, 439 F.3d 245 (4th Cir. 2011). But see Gooden v. Unum Life Ins. Co. of Am., No. 14-280, 2016 WL 3059752, at *8 (E.D. Tenn. Mar. 30, 2016) (finding that a non-negotiated group discount did not constitute a contribution). Giving the word "contribution" its plain meaning, the Court finds it persuasive that an employee's receipt of a group discount by virtue of participation in a group plan established by the employer constitutes a "contribution" for purposes of the Safe Harbor provision.

[37] See Randol v. Mid-West Nat'l Life Ins. Co., 987 F.2d 1547, 1550 (11th Cir. 1993).

[38] Maintanis Aff. ¶¶ 4–5. Plaintiff contends that the Maintanis Affidavit is deficient because she states only that she is an IDI Service Specialist, II with Unum, but does not explain what this position entails, her insurance qualifications, her length of time with Unum, any personal familiarity with Plaintiff's Policies or file, or that any of her statements are based upon her personal knowledge of Unum's policies. Ms. Maintanis's affidavit, however, states that it is based on personal knowledge and, for each averment, she provides detailed documentary evidence to support it. To the extent Plaintiff argues that her affidavit is inconsistent with his evidence, such an argument goes to the weight of her affidavit and not its admissibility.

[39] Id. ¶¶ 3, 6.

[40] The 1984, 1985, and 1997 Policies were included in Unum FlexBill Number 462503G1. The 1992 and 1993 Policies were added to FlexBill Number 121858G1. Maintanis Aff. ¶¶ 9-12,20-23, 52-55, 32-33, 43-44. Plaintiff argues that Unum unilaterally created the FlexBill account and that AIU neither negotiated discount rates

Plaintiff received group premium discounts as a result of his employer's involvement.[41] For example, for the policy period from July 13, 2000 to July 13, 2001, the annual premium for the 1984 Policy would have been $967.46 without the FlexBill arrangement, but was only $870.71 through FlexBill;[42] the annual premium for the 1985 Policy would have been $1,038 without FlexBill, but was only $934.20 through FlexBill;[43] the annual premium for the 1992 Policy would have been $1,784.13 without FlexBill, but the invoice sent to AIU for this policy period was only $1,516.53;[44] and the annual premium for the 1997 Policy would have been $305.50 without FlexBill, but was $274.95 through FlexBill.[45]

Second, Defendant has produced evidence that, for all five Policies, AIU made at least some payments on AIU checks for Plaintiff's premiums over the years.[46] With respect to the 1997 Policy, Defendant produced an AIU check for Plaintiff's premiums for the policy year

---

for its employees with Unum, nor requested that Unum establish a FlexBill account. Pl.'s Resp. Opp'n 13. The Maintanis Affidavit, however, avers that the creation of the FlexBill account is up to the customer. Maintanis Aff. ¶ 5. A November 13, 1991 letter from the agent, Mr. Lipschutz, reveals that he requested, on behalf of AIU, that Plaintiff's, Dr. Walker's, and Dr. Weisman's 1992 policies be included in Unum FlexBill. Def.'s Mot., Ex. 15. Indeed, the FlexBill program present in this case has been expressly held to constitute an employer "contribution." See Tannenbaum v. Unum Life Ins. Co., 2006 WL 2671405, at *7–8 (E.D. Pa. Mar. 30, 2015).

[41] Plaintiff contends that, "[a]t most, Defendant has produce[d] evidence that Dr. D'Elia received a discount on the 1984, 1985 and 1997 Policies for one single payment period per Policy." Pl.'s Sur-Reply Br. 5. He further asserts that the record contradicts any inference that these policies received similar premium discounts from the date they were issued to the present simply by virtue of their inclusion in the FlexBill program. In support, he provides a single piece of evidence showing that the 1984 and 1985 Policies did not immediately qualify for FlexBill discounts. Pl.'s Sur-Reply Br., Ex. A, at UA-AP-LAN709795-000018–020, UA-AP-LAN767140-000006. As set forth in the Maintanis Affidavit, however, these policies were never billed outside the FlexBill arrangement. Plaintiff's evidence does not undermine the conclusion that these Policies eventually received a FlexBill discount, which constitutes an employer contribution. Maintanis Aff. ¶ 18. Plaintiff also asserts that he did not receive the discounted premium price for either the 1992 or 1993 Policies during the pay period of 1993 to 1994. Pl's Sur-reply at 6. However, the evidence shows that the Policies were grouped into a FlexBill arrangement at the outset, despite the apparent absence of a discount for the 1993-1994 year.

[42] Maintanis Aff., Ex. 1, at FLEX #2 07–08.

[43] Maintanis Aff., Ex. 1, at FLEX #2 07–08.

[44] Def.'s Resp. to Supplement to Sur-Reply, Exs. 20, 21.

[45] Maintanis Aff., Ex. 1, at FLEX #2 07–08.

[46] Maintanis Aff. ¶¶ 18, 29, 50, 50, 56, Exs. 2, 4.

2000–2001.[47]

Plaintiff challenges Defendant's evidence in two ways. First, Plaintiff relies on the Affidavit of Patrick E. Melvin, who states that he is a certified public accountant who has worked on AIU's accounting since January 2009.[48] Mr. Melvin avers that he reviewed the July 8, 2011 AIU check sent to Defendant, which was issued while he was employed by AIU.[49] He contends that this check "was paid by AIU, but charged as a distribution and as taxable income to Dr. Frank D'Elia," and that during the six years he worked with AIU, "all of Dr. D'Elia's premium payments to UNUM were similarly charged as a distribution and as taxable income to Dr. D'Elia" with no funding by AIU.[50] He claims that Plaintiff received no favorable tax structuring as a result of AIU's payment of premiums to Unum.[51]

This affidavit, however, does not refute Plaintiff's receipt of a group discount. Moreover, Mr. Melvin does not appear to have personal knowledge of the matters discussed in his affidavit, as is required under Federal Rule of Civil Procedure 56(c)(4).[52] Mr. Melvin states that his involvement with AIU's accounting began in January 2009, and does not establish any knowledge of accounting practices or premium payments for any of the five Policies before that time. Mr. Melvin also does not suggest that he reviewed any AIU documents other than the July 8, 2011 check. Although Mr. Melvin purports to opine that (1) Plaintiff received no favorable

---

[47] Maintanis Aff. ¶¶ 18, 29, 50, 50, 56, Exs. 2, 4.

[48] Pl.'s Resp. Opp'n, Ex. A, Aff. of Patrick Melvin ("Melvin Aff.") ¶¶ 2–3.

[49] Id. ¶¶ 4–5.

[50] Id. ¶¶ 6–8.

[51] Id. ¶ 9

[52] "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

tax structuring as a result of disability premium payments by AIU and (2) all checks paid by AIU to UNUM were actually charged as a distribution and taxable income to Plaintiff, he does not indicate any knowledge of Plaintiff's personal tax documents or finances or reference any such documentation. The affidavit therefore does not serve as persuasive evidence.

Plaintiff also argues that the volume and timing of Defendant's evidence is inadequate to meet its burden. For example, in his original opposition brief, Plaintiff claimed that Defendant provided only two statements showing that AIU was directly billed for the 1992 and 1993 Policies, but no statements showing that it was ever billed for the 1984, 1985, or 1997 Policies. As to the 1992 and 1993 Policies, Plaintiff contended that Defendant did not produce a single statement between 1993 and the time Plaintiff's claim was billed to show that AIU was ever billed again for the Policy. He points out that one of the two statements provided by Defendant showed that the 1993 Policy was paid by Plaintiff personally.[53] Plaintiff also asserted that Defendant only provided checks from the FlexBill file for eight of the thirty years Plaintiff maintained insurance with Unum, only two of which had itemized breakdowns showing which policies they covered. Although Defendant's Reply Brief responded to many of these challenges by producing additional evidence, Plaintiff then argued that "AIU did not contribute in any legally sufficient manner to the Policies" since the contributions were not numerous enough to show that AIU paid for or contributed to the Policy.[54] Although Plaintiff conceded that AIU made payments, he claimed they were merely pass-through payments.

Despite Plaintiff's objections, the evidence in this case is consistent with that held

---

[53] Def.'s Mot., Ex. 14, at FLEX07; Ex. 8, at 15.

[54] Pl.'s Reply Br. at 4; Pl.'s Resp. Opp'n at 9.

sufficient to establish employer contribution in other cases.[55] Defendant has produced evidence for each of the five Policies that AIU paid premiums on several occasions, and Plaintiff received a premium discount on those Policies. Contrary to Plaintiff's assertions, AIU did not simply allow pass-through payments, but actually contributed to the Policies. Even to the extent Plaintiff could prove that AIU was simply advancing premiums that he ultimately paid, such advancements would still constitute interest-free loans that amounted to contributions to the Policies. Defendant has no defined obligation to produce invoices and checks for every annual policy period, over the course of thirty years, for each of five Policies. The first Safe Harbor factor fails if the employer makes any contributions, and Defendant has established that in this case. As all four factors must be met for the Safe Harbor provision to apply, the Court need not address the remainder of this provision.

### B. The ERISA Elements

The inapplicability of the Safe Harbor provision does not alter Defendant's burden to demonstrate that the policies meet the five criteria of the ERISA statute and therefore that this is an ERISA case. The Court turns to that inquiry.[56]

---

[55] See Spillane v. AXA Financial, 648 F. Supp. 2d 690 (E.D. Pa. 2009) (holding sufficient as evidence of contribution that the employer and employees shared the premium payments and the policies were issued with a volume discount, and that the plaintiff had not submitted contrary documentation). Plaintiff relies heavily on Byard v. QualMed Plans for Health, 966 F. Supp. 354, 354 (E.D. Pa. 1997), for the proposition that Defendant's production of sporadic evidence regarding AIU's contributions is insufficient to defeat operation of the Safe Harbor. This case is inapposite. In that case, the employer would only pay premiums for the policy if the plaintiff had paid those premiums to the employer in advance. Id. at 356-57. If not, the plaintiff would be dropped from the policy. Id. On one occasion, the employer had made a one-time, single contribution of $47.84 to make up for a deficiency in a premium payment by the employee. The court held that it would be "pointlessly unforgiving" to allow such a one-time minuscule payment to defeat the application of the Safe Harbor provision, particularly when the plaintiff typically overpaid for the premium. Id. at 359.

[56] The discussion that follows necessarily overlaps in part with that of the applicability of the Safe Harbor provision. The Safe Harbor provision "describes the extent to which an employer may be involved with a group insurance program offered to its employees [and] removes such group insurance programs from the sphere of ERISA coverage" if the program satisfies the four elements of section 2510.3–1(j))." Arsdel, 2016 WL 1237317, at *11 (quotation omitted). If the court determines that all of the Safe Harbor criteria are satisfied, then the court would

### 1. Element One: Plan, Fund, or Program

The first element of an ERISA-covered welfare benefit plan requires the existence of a plan, fund, or program. In the Third Circuit, a "plan, fund, or program" under ERISA is established if "from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits."[57]

Plaintiff concedes that a reasonable person could ascertain from the Policies the intended benefits, class of beneficiaries, and the procedures for receiving benefits.[58] He asserts, however, that the record contains insufficient evidence regarding the source of funding for the Policies, as there were no pre-claim statements for the 1984, 1985, or 1997 Policies showing to whom the policy premiums were billed, and the 1997 Policy application does not state that the 1997 Policy is to be "employer paid." Plaintiff further identifies the absence of evidence showing that a formal benefits plan existed at AIU, that disability insurance was supplied by AIU, that AIU ever allowed Unum to publicize its policies to AIU employees, or that Unum agent Mr. Lipschutz had any professional relationship with AIU. Plaintiff asserts that Mr. Lipschutz met Plaintiff while Plaintiff was a resident at Thomas Jefferson University, and that Plaintiff applied

---

necessarily conclude that (1) the employer did not establish or maintain the plan, and (2) ERISA does not govern the claims here. McCann, 921 F. Supp. 2d at 364 (citing Schneider v. UNUM Life Ins. Co. of Am., 149 F. Supp. 2d 169, 176 (E.D. Pa. 2001)). But a determination that the Safe Harbor criteria are not satisfied does not compel the conclusion that the claim is governed by ERISA. McCann, 921 F. Supp. 2d at 364 (citing Gaylor v. John Hancock Mut. Life Ins. Co., 112 F.3d 460, 463 (10th Cir. 1997)). "[A] program that fails to satisfy [each of the Safe Harbor criteria] is not automatically deemed to have been 'established or maintained' by the employer, but, rather, is subject to further evaluation under the conventional tests." Id. (quoting Gaylor, 112 F.3d at 463 (internal citation omitted)).

[57] Deibler, 973 F.2d at 209 (citations omitted). Accord Smith v. Hartford Ins. Grp., 6 F.3d 131, 136 (3d Cir. 1993).

[58] Pl.'s Opp'n Mot. for Choice of Law ("Pl's Opp'n") 20.

for the 1984 Policy prior to his employment with AIU.[59] In addition, Plaintiff has produced a single check from his personal account to UNUM, dated July 2, 2001, in the amount of $2,723.89, for the 1993 Policy.[60]

As discussed above, Defendant has produced evidence that AIU was a source of financing, including that Plaintiff stated on his applications for the Policies that the premium notices were to be billed to the employer, and that AIU received the premium invoices and issued payments on company checks.[61] As recently as 2014, Plaintiff produced in discovery two invoices for premiums due for all five Policies addressed to AIU.[62] Defendant also submitted an affidavit with supporting documents showing that AIU paid premiums for all five Policies.[63]

Defendant has met its burden. "[A]ll that is required to satisfy this prong is that the source of funding can be identified.[64] "The source of funding may be the employer, the employee, or a combination of both."[65] In this case, AIU was at least in part the source of funding. The Court finds that Defendant has established this element.

### 2. Elements Two and Three: Established or Maintained by an Employer

The second and third ERISA elements require that the plan be established or maintained by an employer.[66] "The disjunctive nature of the 'established or maintained' language appearing

---

[59] Def.'s Mot., Ex. 1, at 11; Ex. 2, at 1.

[60] Pl.'s Supp. to Sur-Reply, Ex. D.

[61] Def.'s Mot., Exs. 7, 11, 14, 17.

[62] Def.'s Mot., Ex. 17.

[63] Maintanis Aff. ¶¶ 13, 18, 22, 24, 34, 35, 40, 49, 50.

[64] Spillane, 648 F. Supp. 2d at 696.

[65] Tannenbaum, 2006 WL 2671405, at *4 (internal quotation omitted).

[66] The second and third prongs of the test are closely intertwined and are discussed jointly. Keenan v. Unum Provident Corp., 252 F. Supp. 2d 163, 167 (E.D. Pa. 2003).

in the statute suggests that a showing of either one is sufficient to give rise to ERISA's application."[67] "To determine whether an employer 'established or maintained' an employee benefit plan, 'the court should [focus] on the employer . . . and [its] involvement with the administration of the plan.'"[68] "In order to establish or maintain a plan, there must be some meaningful degree of participation by the employer in the creation or administration of the plan, and an intent to provide its employees with a welfare benefit program."[69] "[N]o single act in itself necessarily constitutes the establishment of a plan, fund or program."[70] It is enough, however, that at its inception, the plan was an ERISA plan, regardless of whether it eventually is maintained strictly by the insured.[71]

"One of the touchstones of a plan that is governed by ERISA is the 'establishment and maintenance of a separate and ongoing administrative scheme,' which the plan administrator must set up in order to determine eligibility for benefits."[72] The purchase of insurance by an employer is "strong evidence" that the employer has established or maintained the plan under ERISA.[73] In addition, a request made on an insurance application that premium notices be mailed to the employer provides further evidence that the employer established or maintained the

---

[67] Spillane, 648 F. Supp. 2d at 696 (quoting Cowart v. Metro. Life Ins. Co., 444 F. Supp. 2d 1282, 1293 (M.D. Ga. 2006)).

[68] Stone, 288 F. Supp. 2d at 690 (quoting Hansen v. Cont'l Ins. Co., 940 F.2d 971, 978 (5th Cir. 1991) (ellipses in Stone) .

[69] McCann, 921 F. Supp. 2d at 368 (quoting Weinstein v. Paul Revere Ins. Co., 15 F. Supp. 2d 552, 558 (D.N.J. 1998).

[70] Donovan v. Dillingham, 688 F.2d 1367, 1373 (11th Cir. 1982).

[71] Stern v. Provident Life and Acc. Ins. Co., 295 F. Supp. 2d 1321, 1326-27 (M.D. Fla. 2003) (internal citation omitted).

[72] Menkes, 762 F.3d at 290 (quoting Shaver v. Siemens Corp., 670 F.3d 462, 476 (3d Cir. 2012)).

[73] Spillane, 648 F. Supp. 2d at 696.

plan.[74]

Defendant argues that AIU clearly established or maintained Plaintiff's Policies. For example, Plaintiff's applications stated that his employer was responsible for paying the premiums,[75] and invoices for the premiums were sent to AIU, who paid them on company checks.[76]  Plaintiff does not deny that AIU was his employer, but argues that Defendant has not carried its burden in showing that AIU purchased Plaintiff's policies.   Specifically, he asserts that Defendant "has not provided a single pre-claim Statement from the thirty year period during which Dr. D'Elia maintained the 1984 or 1985 Policies reflecting that AIU was purchasing these Policies.   Nor has AIU produced an application for the 1997 Policy identifying it as being 'employer paid', or even a single pre-claim Statement reflecting who was purchasing the 1997 Policy."[77]  The Court finds that AIU, Plaintiff's employer, "established or maintained" a plan as to each Policy.

      *a. The 1984 Policy*

Plaintiff's application for the 1984 Policy identifies his employer as "Urological Associates" and instructs Defendant to "Send Premium Notices to Employer's Address."[78] Plaintiff also confirms that the policy is "Employer Paid."[79] Although Plaintiff argues that he applied for the 1984 Policy while still a resident at Thomas Jefferson University, the Policy was

---

[74] Id. at 697; see also Keenan, 252 F. Supp. 2d at 167 (noting that bills sent by insurance company to employer "further confirm" finding that employer established or maintained plan).

[75] Def.'s Mot., Ex. 1, at 3, 11; Ex. 2, at 5, 13; Ex. 3, at 10; Ex. 4, at 8; Ex. 11.

[76] Id., Exs. 7, 11, 14, 17.

[77] Pl.'s Resp. Opp'n Mot. 21.

[78] Def.'s Mot., Ex. 3, at 1, 11.  See Tannenbaum, 2006 WL 2671405, at * 5 (evidence that premium notices were sent directly to employer).

[79] Def.'s Mot., Ex. 2, at 5, 13. Tannenbaum, 2006 WIL 2671405 at *1 (employer paid the policy premiums,

issued on July 6, 1984, after Plaintiff completed his residency.[80] The 1984 Policy was only billed through the FlexBill program.[81] The premium invoices for FlexBill number 462503G1, which included the 1984 Policy, were billed to AIU for the policy periods including 1999–2000, 2000–2001, 2007–2008, 2011–2012, and 2014–2015.[82] AIU paid the premium amounts for FlexBill number 462503G1, including the 1984 Policy, in at least 1999.[83]

*b. The 1985 Policy*

Plaintiff's application for the 1985 Policy identifies his employer as "Urological Associates," indicates that his "Employer" will pay premiums, and instructs Defendant to "Send Premium Notices to Employer's Address."[84] The application file also states that this Policy is "Employer Paid."[85] Premium invoices were addressed to AIU for policy years 1999–2000, 2000–2001, 2007–2008, 2011–2012, and 2014–2015.[86] In addition, AIU paid the premium for

---

which were usually repaid by the employees).

[80] Def.'s Mot., Exs. 1, 2. The agent, Mr. Lipschutz, sold both Plaintiff's and those of his partners at AIU. While Mr. Lipschutz's exact role is unclear, Plaintiff has not offered any sworn testimony or affidavits to counter evidence that Mr. Lipschutz may have had an employer-designated role in selling these policies.

[81] Maintanis Aff. ¶ 11.

[82] Id. ¶ 17, Ex. 1, at FLEX#2 06, FLEX#2 07–9, FLEX#2 19, FLEX#2 24, FLEX#2 29.

[83] Id. ¶ 18, Ex. 2. In Plaintiff's Supplement to Sur-Reply—the sixth brief submitted with respect to this Motion—Plaintiff produces an April 7, 1997 letter from Unum to his home address concerning additional riders for the 1984 policy. He asserts that "[t]his letter demonstrates that as of April 1997, [Defendant] was still sending communications concerning the 1984 Policy directly to Dr. D'Elia's personal residence, rather than to Dr. D'Elia's place of employment, Associates in Urology." (Pl.'s Supp. to Sur-reply 2, Ex. A.). The fact that some communications were sent to Plaintiff directly does not undermine the conclusion that AIU maintained or established a plan. Spillane, 648 F. Supp. at 697 (the plaintiff paid annual premiums after resigning, but the employer nevertheless had maintained or established the plan). Accord Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 46 (1987) (ERISA to be interpreted broadly).

[84] Def.'s Mot., Ex. 3, at 10. See Keenan, 252 F. Supp. 2d at 167 (finding that the employer established or maintained the plan where the billing address was that of the employer and the premium invoices were sent to the employer).

[85] Def.'s Mot., Ex. 4, at 8.

[86] Id. ¶ 28, Ex. 1. See McCann, 921 F. Supp. 2d at 369 (finding that the hospital established the residents' supplemental disability plan because (a) multiple resident doctors purchased policies under the plan, and (b) the hospital assumed some responsibility for administration of the plan by engaging a broker to make residents aware of

at least policy year 1999.[87] The 1985 Policy was also part of the FlexBill arrangement.[88]

### c. The 1992 Policy

Plaintiff's application for the 1992 Policy stated that his employer, AIU, would pay premiums and that premium notices should be sent to AIU.[89] AIU unequivocally paid Plaintiff's initial premiums, as well as premiums for policy years 1993, 1996, 1999, 2000, and 2011.[90] Further, premium invoices were addressed to AIU for the policy years 1993–1994, 1994–1995, 1996–1997, 1999–2000, 2000–2001, 2003–2004, 2007–2008, and 2011–2012.[91] Finally, the fact that Plaintiff's 1992 Policy was purchased on the same day as those of Drs. Weisman and Walker suggests that AIU established or maintained those policies.[92]

### d. The 1993 Policy

The application for the 1993 Policy states that it was to be added "to existing FlexBill #121858G1."[93] AIU paid Plaintiff's premiums for the policy years 1993, 1994, 1996, 1999, 2000, and 2011, again evidencing that it initially "established" the Policy.[94] AIU's "maintenance" of the Policy is reflected in premium invoices addressed to AIU for the policy years 1993–1994, 1994–1995, 1996–1997, 1999–2000, 2000–2001, 2003–2004, 2007–2008, and

---

the opportunities and explain the available benefits).

[87] Id. ¶ 29, Ex. 2.

[88] Maintanis Aff., Ex. 1, at FLEX #2 07–08.

[89] Def.'s Mot., Ex. 5, at 15.

[90] Maintanis Aff. ¶ 40, Exs. 2 & 4.

[91] Id. ¶ 39, Ex. 4

[92] Spillane, 648 F. Supp. 2d at 697.

[93] Maintanis Aff. ¶ 50, Exs. 2 & 4.

[94] Id.

2011–2012.[95] Plaintiff argues that his application stated that he was personally paying the premiums, but should be billed at his business address.[96] Nevertheless, AIU maintained the policy by handling the invoices.[97] Plaintiff also attaches a check from Plaintiff's personal account to Unum, dated July 2, 2001, in the amount of $2,723.89 for the 1993 Policy.[98] He asserts that this check supports that he paid for the Policy from his own funds and did not receive the FlexBill discount rate of $2,227.89. The Court declines "to accept the proposition that when the employee assumes the payment of the premiums in place of the employer, the policy is no longer governed by ERISA."[99] Evidence of a singular payment by Plaintiff over the course of more than twenty years does not undermine a finding that AIU otherwise maintained this Policy, accepted premium invoices, and ensured that Plaintiff received the benefit of a premium discount.

### e. The 1997 Policy

Defendant produced an AIU check for Plaintiff's premiums for the policy year 2000–2001.[100] Premium invoices were addressed to AIU for the policy years 1999–2000, 2000–2001, 2007–2008, 2011–2012, and 2014–2015.[101] The application file shows that the

---

[95] Id. ¶ 49, Ex. 4. See Viechnicki v. Unumprovident Corp., No. 06-2640, 2007 WL 433479, at *3-4 (E.D. Pa. Feb. 8, 2007) (finding the employer maintained or established the plan where the application for the insurance listed plaintiff's employer as his billing address and named the employer as policyholder, other employees had applied for the same coverage, and the employer had been designated as the address for the billing notice and the employer paid the premiums for years prior to the plaintiff assuming responsibility for payment).

[96] Def.'s Mot., Ex. 8, at 15.

[97] See Tannenbaum, 2006 WL 2671405, at *5 (finding that the employer maintained the plan when for ten years, Unum Life billed the premiums for the plaintiff's policies as a part of a FlexBill arrangement, which were sent to the employer and which included the premium charges for two of the plaintiff's colleagues).

[98] Pl.'s Supp. to Sur-reply, Ex. D.

[99] Viechnicki, 2007 WL 433479, at *4 (citing cases).

[100] Maintanis Aff. ¶ 57, Ex. 2.

[101] Id. ¶ 60, Ex. 1.

Policy was "Employer Paid."[102]

In short, the Court finds that for all five Policies, AIU had a "meaningful degree of participation" in the creation or administration of the plan.[103] Accordingly, this factor of the ERISA analysis has been satisfied.

### 3. Element 4: For the Purpose of Providing Benefits

The fourth element at issue in this case is whether a plan was established or maintained for the purpose of providing health care or disability benefits. Courts have found that an employee's receipt of a volume discount from an insurer for participating in a group shows that the employer intended to provide a benefit to the employee.[104] This is particularly true where the premium discount is received only because the insurance was purchased together with other employees of the company.[105] In addition, the fact that a split dollar arrangement is used is evidence that the employer meant to provide a benefit to the employee.[106]

In the present case, it is undisputed that Plaintiff is the named insured under the Policies, which directly provided him, as an employee of AIU, with disability insurance. Moreover, as discussed in detail above, Plaintiff received a volume discount on his premiums by virtue of the Policies being billed under a FlexBill arrangement with Defendant. Finally, as set forth above, for some of the Policies, Plaintiff and AIU had a split dollar arrangement, while in other cases,

---

[102] Def.'s Mot., Ex. 10.

[103] Plaintiff also argues that neither he nor AIU intended for his disability policies to be governed by ERISA. However, the determination of whether ERISA governs a plan "does not turn on whether [the employer] intended the plan to be governed by ERISA, but rather on whether [the employer] intended to establish or maintain a plan to provide benefits to its employees as part of the employment relationship." Anderson v. UNUM Provident Corp., 369 F.3d 1257, 1263-64 (11th Cir. 2004).

[104] Harding v. Provident Life & Acc. Ins. Co., 809 F. Supp. 2d 403, 416 (W.D. Pa. 2011) (citing Spillane, 648 F. Supp. 2d at 698).

[105] Viechnicki, 2007 WL 433479, at *4.

AIU simply paid the premiums. Such evidence is sufficient for a reasonable person to find that AIU maintained the Policies for the purpose of providing long-term disability benefits to Plaintiff.[107]

### 4. Element Five: To Its Participants or Beneficiaries

Plaintiff does not challenge Defendant's assertions as to the fifth element of the ERISA test. Accordingly, the Court need not address it.

## III. CONCLUSION

Having thoroughly reviewed the parties' seven sets of briefs and evidentiary submissions, the Court finds that Defendant has met its burden of proving that the Safe Harbor provision of ERISA does not apply and that the Policies satisfy the five factors for ERISA application. The quality and substance of the evidence compel the conclusion that the Policies must be governed by the ERISA statute. To the extent the Court has not addressed specific evidentiary challenges raised by Plaintiff, they have been considered and rejected. Accordingly, Defendant's choice of law motion will be granted. An appropriate order will be entered.

---

[106] Spillane, 648 F. Supp. 2d at 697.

[107] In an effort to dispute this evidence, Plaintiff argues that the FlexBill for the 1984, 1985, and 1997 Policies do not meet the requirements for the FlexBill Program because, according to the Maintanis Affidavit, "[t]o qualify for billing under the FlexBill program, the customer must include policies for three or more individual participants working full-time for the same company, and each individual participant must be receiving qualifying insurance products from Unum." Pl.'s Sur-reply Br. 12 (quoting Maintanis Aff. ¶ 4). Yet, according to Plaintiff, the documentation shows that only Plaintiff and Dr. Weisman were associated with this FlexBill account, meaning that the 1984, 1985, and 1997 Policies could not be billed as part of a group receiving a group discount. Plaintiff goes on to argue that the evidence reflects that Plaintiff did not receive an option for discount on the premiums for either the 1984 Policy from 1984 through at least 1986, or the 1985 Policy from 1985 through at least 1986. Nor did Plaintiff receive the discounted premium price for the first two years on his 1992 Policy or the first year on his 1993 Policy. Although there are some discrepancies in the evidence, they are minor and do not undermine the undisputed evidence that these three Policies were, in fact, billed under a FlexBill number and Plaintiff actually received group discounts on all five of his Policies at some point. Moreover, Defendant has shown employer payment on all of these Policies, which is evidence that the Policies were maintained for the purpose of providing long-term disability benefits.